IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:20CR38-1 |
| | ) | |
| CRAIG STANFORD EURY, JR. | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Before the court are three separate motions by Defendant Craig Stanford Eury, Jr., to dismiss the indictment. (Docs. 21, 23, 24.) Eury also seeks to compel grand jury materials. (Doc. 25.) A hearing was held on December 10, 2020, and the court ordered supplemental briefing. All motions are now fully briefed (Docs. 31-34, 43-46, 52-55). For the reasons set forth below, the motions will be granted in part and denied in part.

## I. BACKGROUND

Eury filed his motions to dismiss pursuant to Federal Rule of Criminal Procedure 12(b). Because these are pre-trial motions, the court accepts as true the Government's version of the facts, as set forth in the indictment and, where applicable, the bill of particulars. See United States v. Thomas, 367 F.3d 194, 197 (4th Cir. 2004) ("To warrant dismissal of the indictment, [the defendant] would need to demonstrate that the allegations therein, even if true, would not state an offense."); United States v. Roof, 225 F. Supp. 3d 438, 455 (D.S.C. 2016) (reviewing facts in both

indictment and bill of particulars on defendant's motion to dismiss).

This case stems from the 2014 indictment and plea agreement of International Labor Management Corporation ("ILMC"), a now-defunct business that prepared visa applications on behalf of client companies for temporary alien workers under the H-2A and H-2B visa programs. (Doc. 1 ¶ 1.) Eury founded ILMC in 1994 and was president until 2008, after which he remained the owner and retained control over the management and finances of the company. (Id. ¶ 3.) During the relevant time Eury was also the director of the North Carolina Grower's Association ("NCGA"), a North Carolina non-profit in the business of obtaining H-2A agricultural workers for its member farmers. (Id. ¶ 8; Doc. 17 at 5.)

In January 2014, a federal grand jury returned an indictment against ILMC, charging the company with 40 felony violations of federal law, including encouraging and inducing aliens to enter and reside in the United States for commercial advantage, obtaining visas by fraud, and engaging in monetary transactions with criminal proceeds. (Doc. 1 ¶ 12.) In July 2014, ILMC pleaded guilty to the charges against it (the "ILMC Plea Agreement").[1] (Id. ¶ 13.) The court accepted the plea on July 31 after a change of plea

---

[1] A year later, Eury individually pleaded guilty to two counts of conspiracy in violation of 18 U.S.C. § 371. United States v. Eury, No. 1:14CR39-1 (M.D.N.C. June 23, 2015) (Doc. 100).

hearing (id.), and ILMC ceased operations thereafter when the U.S. Department of Labor issued a notice debarring ILMC from participating in the H-2A and H-2B visa programs (id. ¶ 18).

Relevant here, the ILMC Plea Agreement included a forfeiture provision in which ILMC "consent[ed] and agree[d] to forfeit . . . all assets . . . including, without limitation all bank accounts, cash on hand, furnishings, fixtures, and equipment, accounts receivable, computers, intellectual property, and any other property, tangible or intangible, belonging in whole or in part" to ILMC. (Id. ¶ 15.) The ILMC Plea Agreement also contained an agreement to consent to a money judgment in the amount of $1,120,000.[2] (Id. ¶ 16.) On October 30, the court entered an order of forfeiture against ILMC, which noted that ILMC had agreed to "immediately and voluntarily release and forfeit all property constituting or derived from proceeds from the criminal violations" and directed that the order of forfeiture for $1,120,000 be included in the criminal judgment in ILMC's criminal

_____

[2] In full, the relevant paragraphs reads: "The specific property to be forfeited includes but is not limited to all assets of the defendant corporation, including, without limitation all bank accounts, cash on hand, furnishings, fixtures, and equipment, accounts receivable, computers, intellectual property, and any other property, tangible or intangible, belonging in whole or in part to INTERNATIONAL LABOR MANAGEMENT CORPORATION. The defendant further knowingly and voluntarily consents and agrees to the entry of a forfeiture money judgment in the amount of $1,120,000.00. The parties agree that this sum represents the proceeds obtained directly or indirectly from the offenses to which the defendant is pleading guilty, and is therefore subject to forfeiture pursuant to Title 8, United States Code, Section 1324(b)(1), and Title 18, United States Code, Section 982(a)(6)(A)." (Doc. 23-1 ¶ 6b.)

3

case (the "Forfeiture Order"). (Id. ¶ 19.) The Government alleges that, as of the filing of the current indictment against Eury, ILMC had a remaining balance of $829,327 on its money judgment. (Id. ¶ 22.)

In the current indictment against Eury, the Government alleges that he has interfered with the forfeiture of two items of ILMC property which the Government contends was forfeited to the United States as part of the ILMC Plea Agreement: the Guest Worker Program, which is a computer program jointly developed for ILMC and NCGA to facilitate the application of H-2A and H-2B visas; and the ILMC Database, which consists of proprietary ILMC business information including client and worker data. (Id. ¶¶ 9-10.) The Government contends that ILMC had an interest in both the Guest Worker Program and the ILMC Database, that both were property of ILMC, and that as such both had been forfeited to the Government pursuant to the ILMC Plea Agreement and Forfeiture Order. (Id. ¶ 23.)

The Guest Worker Program was created by a computer consultant, Charles Snell, and his company, Data AnyWare, in June 2006. (Doc. 17 at 2.) The program was paid for by ILMC and NCGA and was structured based on their business operations. (Id.) Data AnyWare retained the right to reuse certain aspects of the base computer code as part of the agreement. (Id. at 2-3.) However, the Government contends that Snell considered the program to be the

4

intellectual property of ILMC and NCGA and would only transfer any aspect of the program to another company with the express authority of Eury. (Id. at 5; Doc. 52.) Each company was given an individual access point to access data contained on the Guest Worker Program. (Doc. 17 at 3.) With certain limited exceptions, the data contained on each so-called company "silo," such as the ILMC Database, was confidential to each company and could not be accessed by other companies or by the general public. (Id.) The ILMC Database was comprised of ILMC-specific business data including confidential information about its clients, visa applications, guest workers, and billing information. (Id.)

The Government alleges that Eury, after the ILMC Plea Agreement, took control of the Guest Worker Program and the ILMC Database and directed their transfer to two other companies, National Agricultural Consultants, LLC ("NAC") and Application Services and Administrative Programs, LLC ("ASAP"). (Doc. 1 ¶¶ 29-32.) NAC was formed on August 3, 2014 -- three days after the court accepted ILMC's guilty plea -- by a former employee of ILMC for the purpose of providing continued visa services to former ILMC clients using ILMC's Guest Worker Program and its contents. (Id. ¶¶ 26-27.) ASAP was another entity in the temporary worker field; Eury partly owned and controlled the company's finances and

operations. (Id. ¶¶ 6-7.)[3] The Government contends that Eury directed Snell to transfer the Guest Worker Program and the ILMC Database to ASAP on August 7, 2014, one week after ILMC pleaded guilty. (Doc. 17 at 7.) Later, Eury directed Snell to grant NAC access to the ILMC Database. (Id. at 8-9.) These actions allowed ASAP and NAC to continue to serve former ILMC clients. (Id. at 8-10.) Neither ASAP nor NAC paid for this transfer of ILMC property. (Id. at 7, 10.) The Government alleges that NAC and ASAP, at the direction of Eury, agreed to a "subscription model" whereby NAC utilized the Guest Worker Program and ILMC Database to serve former ILMC clients, who would pay a recruiter fee to ASAP for each worker brought into the United States on an H-2A visa. (Id. at 10.) Because Eury was a co-owner of ASAP, this arrangement allowed him to receive money from former ILMC clients. (Id.) The Government alleges that between August 2014 and December 2015, NAC clients, who were former ILMC clients, paid ASAP a total of $544,132, a "substantial portion" of which was directly transferred to Eury for his personal use. (Id.) The Government alleges Eury took further steps to conceal the transfer of the Guest Worker Program

---

[3] Neither the indictment nor the bill of particulars contains much information about ASAP. The Government alleges that as a result of the transfer of the Guest Worker Program and ILMC Database, "ASAP had possession of all ILMC data and had effectively taken its place." (Doc. 17 at 8.) Eury contends that ASAP was a separate company formed in 2009 and partially owned by him that provided payment processing and other administrative services relating to the placement of temporary workers. (Doc. 21 at 4-5.) ASAP ceased operations in 2016. (Id. at 5.)

6

and ILMC Database, such as directing Snell to create a separate NAC server to host the programs. (Id. at 10-11.)

In January 2020, a federal grand jury returned the present nine-count indictment against Eury. (Doc. 1.) Counts 1 and 2 allege mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; Count 3 alleges obstruction of an official proceeding -- here, the forfeiture action against ILMC, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count 4 alleges theft of government property, in violation of 18 U.S.C. §§ 641 and 2; and Counts 5 through 9 allege money laundering, in violation of 18 U.S.C. §§ 1957 and 2. On March 18, 2020, Eury moved for a bill of particulars. (Doc. 13.) The court held a hearing on June 12 and, in part due to the Government's willingness to comply, subsequently granted the motion, and the Government provided the bill of particulars on June 26. (Doc. 17.) Eury then filed the four present motions which, after a hearing and supplemental briefing, are ready for decision.

## II. ANALYSIS

### A. Standard of Review and Elements of the Crimes Charged

"There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context." United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir. 2005). Instead, Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or

request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).[4]

"A motion to dismiss an indictment tests whether the indictment sufficiently charges the offense the defendant is accused of committing." United States v. Bowling, 108 F. Supp. 3d 343, 348 (E.D.N.C. 2015) (citations omitted). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).

Although Rule 12(b)(1) "authorizes courts to rule on motions involving questions of law, courts will not rule on motions involving questions of fact." United States v. Souder, No. 1:08CR136-1, 2009 WL 88919, at *5 (M.D.N.C. Jan. 12, 2009). Accordingly, an indictment should be dismissed pretrial only when the facts are undisputed and a purely legal question is presented. See id. at *7 ("Several courts have affirmed the pretrial dismissal

---

[4] Rule 12(b) was amended in 2014, substituting "trial on the merits" for the more archaic "trial of the general issue" but without any intended change in meaning. Fed. R. Crim. P. 12(b) Advisory Committee's Note to the 2014 Amendments.

of an indictment where the material facts were undisputed and the government has not objected to their consideration, concluding that a court may determine as a matter of law whether the government could prove its case beyond a reasonable doubt in light of the undisputed facts."). In contrast, a motion "falls within the province of the ultimate finder of fact" if it is "substantially founded upon and intertwined with evidence concerning the alleged offense." United States v. Wilson, 26 F.3d 142, 159 (D.C. Cir. 1994) (internal quotations and citation omitted).

The nine-count indictment in this case alleges violations of four criminal statutes. The mail fraud statute criminalizes "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. To establish mail fraud, "the Government must prove that the defendant (1) knowingly participated in a scheme to defraud and (2) mailed, or caused to be mailed, anything 'for the purpose of executing such scheme.'" United States v. Pierce, 409 F.3d 228, 232 (4th Cir. 2005) (quoting § 1341). "It is essential to a conviction under [the federal mail and wire fraud statutes] that the victim of the alleged fraud actually have an interest in the money or property obtained by the defendant." United States v. Gray, 405 F.3d 227, 234 (4th Cir. 2005).

A conviction under 18 U.S.C. § 1512(c)(2), obstruction of an official proceeding, requires the Government to prove that a defendant "corruptly" (2) "obstruct[ed], influenc[ed], or imped[ed]" (3) "any official proceeding" or attempted to do so. United States v. Young, 916 F.3d 368, 384 (4th Cir. 2019) (quoting § 1512(c)(2)). A forfeiture proceeding is an "official proceeding." See United States v. Farrell, 921 F.3d 116, 141-42 (4th Cir. 2019) (affirming a § 1512(c)(2) conviction for attempted obstruction of a DEA forfeiture proceeding).

A conviction under 18 U.S.C. § 641, theft of government property, requires the Government to prove that "(1) the money or property described in the indictment is money or a thing of value of the United States [and] (2) that the defendant stole, fraudulently received, or converted to his own use (3) with the intent to permanently or temporarily deprive the government of that money or thing of value." United States v. Kiza, 855 F.3d 596, 601 (4th Cir. 2017).

Finally, money laundering under 18 U.S.C. § 1957 is "a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." 18 U.S.C. § 1957(a). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." Id. § 1957(f)(2). In other words, to support a conviction for money laundering, "there must be proof

10

beyond a reasonable doubt that the defendant knowingly participated in a monetary transaction involving criminally derived proceeds." <u>United States v. Najjar</u>, 300 F.3d 466, 481 (4th Cir. 2002). Here, the Government alleges that the other three indicted crimes -- mail fraud, obstruction of an official proceeding, and theft of government property – constitute the "specified unlawful activity" sufficient for a conviction. (<u>See,</u> <u>e.g.</u>, Doc. 1 at 14 ¶ 2.)

With these standards in mind, the court turns to each of Eury's motions.

**B.    Motion to Dismiss Due to Lack of Property Interest**

Eury first moves to dismiss the indictment on the ground that ILMC lacked a requisite property interest to have forfeited. (Doc. 21.)   He argues that each charged offense requires, as a prerequisite, that ILMC had a forfeitable property interest in the Guest Worker Program and ILMC Database, which he contends ILMC did not.   (<u>Id.</u> at 8.)   The Government responds that the indictment sufficiently alleges that ILMC had a property interest in both the Guest Worker Program and ILMC Database and that Eury's challenge raises fact questions not appropriate for resolution at the Rule 12(b)(1) stage.   (Doc. 31 at 2.)

Eury's contentions actually break down into two related, but distinct, arguments.   He argues both that "the Guest Worker Program and the ILMC Database do not constitute forfeitable 'property' for

11

purposes of the criminal statutes at issue" (Doc. 21 at 1) and that "the assumption that forms the basis of each offense in the Indictment is that ILMC held a forfeitable interest in the Guest Worker Program and the ILMC Database" (id. at 1-2). In other words, Eury questions both whether these items were "property" and whether ILMC had a requisite interest in them.

### 1. Property

Whether the Guest Worker Program and the ILMC Database are "property" for purposes of the relevant statutes is a legal question the court can resolve at the Rule 12(b)(1) stage. See, e.g., Cleveland v. United States, 531 U.S. 12, 15 (2000) (vacating a conviction after determining that state licenses are not generally "property" for purposes of the mail fraud statute). It is clear that both the Guest Worker Program and the ILMC Database can be "property."[5]  In general, courts take a broad view on what qualifies as property under the federal fraud statutes.  "The Supreme Court has made it clear that the federal fraud statutes should be 'interpreted broadly insofar as property rights are

---

[5] This distinguishes United States v. Bowling, 108 F. Supp. 3d 343 (E.D.N.C. 2015), relied on by Eury.  In Bowling, the court dismissed an indictment at the Rule 12(b)(1) stage after finding that a government document did not, as a matter of law, constitute "source selection information" such that its disclosure to a private company while that company was bidding for a government contract violated the Procurement Integrity Act.  The facts in that case were undisputed, and the court was considering a purely legal question.  Here, for reasons discussed infra, the main question is whether ILMC had an actual interest in the Guest Worker Program and ILMC Database, an issue that is contested and fact-bound.

concerned.'" Gray, 405 F.3d at 234 (quoting McNally v. United States, 483 U.S. 350, 356 (1987)).[6] Likewise, "The Fourth Circuit takes a broad view of what constitutes a 'thing of value of the United States'" for purposes of theft of government property. United States v. Gill, 193 F.3d 802, 804 (4th Cir. 1999) (quoting 18 U.S.C. § 641). Computer programs can be property. See, e.g., United States v. Susel, 429 F.3d 782, 783 (8th Cir. 2005) (upholding mail fraud conviction based on theft of copyrighted software); Oracle Am., Inc. v. Google Inc., 750 F.3d 1339, 1355 (Fed. Cir. 2014) (noting that it is "well established that copyright protection can extend" to aspects of a computer program including source code).[7] Similarly, "confidential business information" has been recognized as a species of property under the federal mail and wire fraud statutes. Carpenter v. United States, 484 U.S. 19, 26 (1987); see also United States v. Hager,

---

[6] Eury notes that the federal mail fraud statute is "limited in scope to the protection of property rights." McNally, 483 U.S. at 360; see Doc. 21 at 8, 16; Doc. 44 at 4. This is true, but the point of that phrase was to clarify that the federal fraud statutes were limited to property, even broadly defined, and did not encompass vague public corruption rights. See Cleveland, 531 U.S. at 18 & n.2 ("At the time McNally was decided, federal prosecutors had been using [the fraud statutes] to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property" such as a right to honest and impartial government). The point of McNally and progeny was to limit use of the mail fraud statute to schemes that (with use of the mail) defraud others of money or property, and not less tangible "rights" related to generic public corruption. Id.

[7] Eury does not seriously dispute that software code can be property, given his lengthy analysis regarding the copyright of computer code. (Doc. 21 at 12-15.) Rather, his focus is on whether ILMC actually had any interest in the Guest Worker Program.

13

879 F.3d 550, 555 (5th Cir. 2018); <u>United States v. Martin</u>, 228 F.3d 1, 16 (1st Cir. 2000) (upholding conviction for mail and wire fraud when the defendant "knowingly and willingly participated in a scheme to defraud [the victim company] of confidential information . . . and in so doing either harmed [the company] or intended to use the information for his own gain").

Eury argues that the data in the ILMC Database is not property because it does not qualify as "trade secrets" under North Carolina law. (Doc. 21 at 18-19; Doc. 24 at 8.) That is too narrow a conception of "property." A conviction under the federal fraud statutes requires that the victim of the alleged fraud have an interest in the property obtained by the defendant. <u>Gray</u>, 405 F.3d at 234. This does not mean the property interest must constitute "trade secrets" under state law. <u>See</u> <u>United States v. Mancuso</u>, 42 F.3d 836, 845 (4th Cir. 1994) (stating that "the scope of property interests protected is to be construed fairly widely"). Other courts, including the Supreme Court, have examined non-state-law sources in identifying property interests. <u>See, e.g.</u>, <u>Carpenter</u>, 484 U.S. at 26 (citing Supreme Court precedent, another federal statute, and a treatise in concluding that confidential business information was a protected property interest); <u>Hager</u>, 879 F.3d at 555 (rejecting an argument that confidential business information is limited solely to trade secrets as defined by state law and concluding that "[a]lthough state law is a valid source

14

for defining the scope of property rights protected by federal laws, it is not the sole source"); United States v. Mahaffy, 693 F.3d 113, 135 (2d Cir. 2012) ("Information may qualify as confidential under Carpenter even if it does not constitute a trade secret.").

There is a factual dispute whether the information in the ILMC Database was sufficiently confidential or proprietary. Eury contends it was not, because at least some of the information was shared across different company users. (Doc. 21 at 17.) The Government contends the Database "was limited to ILMC personnel with few exceptions." (Doc. 31 at 20.) This is a factual dispute that is not amenable to Rule 12(b)(1) resolution. Eury's motion to dismiss on this basis, therefore, will be denied.

### 2. ILMC Interest

Eury's second contention -- challenging whether ILMC actually had an interest in the Guest Worker Program and ILMC database -- is also not appropriate for resolution at the Rule 12(b)(1) stage, as it is bound up in contested facts.[8] See United States v. Shabbir, 64 F. Supp. 2d 479, 481 (D. Md. 1999) (noting that a Rule "12(b) motion cannot be used as a summary judgment mechanism, nor can the court grant [defendant's] motion if his legal contentions

---

[8] In this motion, Eury briefly argues that the Government also did not have an interest in the Guest Worker Program or ILMC Database. (Doc. 21 at 8-9.) This argument is more fully developed in Eury's second motion to dismiss (Doc. 23), and the court addresses it in Part II.C below.

are inextricably bound up with the facts of the case"). The parties focus most of their attention on the Guest Worker Program, which was created by an outside agency. Eury contends that "[d]espite the fact that the Guest Worker Program was paid for by NCGA, ILMC, and ASAP, it remained the property of Mr. Snell and Data AnyWare." (Doc. 21 at 7; id. at 14-16.) The Government argues that the "Indictment on its face charges that ILMC held an ownership interest in the Guest Worker Program and the ILMC Database . . . and, as such, [they] were forfeit[ed] to the United States pursuant to the ILMC Plea Agreement." (Doc. 31 at 12.) The Government will bear the burden of proving ILMC's ownership interest in both items. For now, the court must accept the facts charged as true. See Thomas, 367 F.3d at 197 ("To warrant dismissal of the indictment, [the defendant] would need to demonstrate that the allegations therein, even if true, would not state an offense."); United States v. Bergrin, 650 F.3d 257, 268 (3d Cir. 2011) (the court's "determination must be based on whether the facts alleged in the indictment, if accepted as entirely true, state the elements of an offense and could result in a guilty verdict"). The facts alleged in the indictment are sufficient to survive a motion to dismiss, which is denied on this ground.

### 3. Deprivation of Government's Interest

Finally, Eury argues that even if the Guest Worker Program and the ILMC Database were forfeitable property, Eury has not

deprived the Government of these rights because the United States knows where each is located and can still take possession. (Doc. 21 at 19-20.) Eury concludes, "At a minimum, [he] has done nothing to hinder the government's ability to take possession of these items." (Id. at 20.)

But that is precisely what the Government charges he has done. The indictment alleges that Eury knowingly directed the transfer of the Guest Worker Program and the ILMC Database to NAC and ASAP, preventing the Government from obtaining forfeitable property to which it was entitled as a result of the ILMC Plea Agreement. Nothing in the elements of the indicted crimes requires that the deprivation be permanent. It would be sufficient, for example, if Eury participated in a scheme via use of the mail to defraud the Government of its interest in both pieces of property for purposes of mail fraud, see Pierce, 409 F.3d at 232, or if he "corruptly . . . obstruct[ed], influenc[ed], or imped[ed]" the Government's forfeiture proceeding, see 18 U.S.C. § 1512(c)(2).[9]

---

[9] Eury repeats this argument in his supplemental brief, citing United States v. Adler, 186 F.3d 574 (4th Cir. 1999), for support. (Doc. 53 at 6-7.) In that case, a company (Adler) that printed custom t-shirts breached a contract with the company (Printgear) that provided the blank shirts. Adler, 186 F.3d at 575. Printgear sued and obtained a default judgment for the full amount due. Id. Subsequently, a grand jury indicted Adler's owners with wire fraud. Id. at 576. In relevant part, the Fourth Circuit held that Printgear's chose in action on Adler's debt was a property interest under the wire fraud statute, but that Adler did not deprive Printgear of that interest because Printgear was able to sue and secure a default judgment. Id.; see Black's Law Dictionary (11th ed. 2019) (defining chose in action as "[t]he right to bring an action to recover a debt, money, or thing"). The Adler court also found that

17

It remains to be seen whether the Government can prove each element beyond a reasonable doubt. But at this Rule 12(b)(1) stage, where the Government's version of the facts is viewed as true, the indictment properly lays out the elements of each crime.

Eury's first motion to dismiss, based on a lack of a property interest (Doc. 21), will therefore be denied.

## C. Motion to Dismiss Due to Failure to Forfeit Alleged Property

In his second motion to dismiss, Eury argues that the indictment should be dismissed because the Government never obtained an order that ILMC forfeit the alleged property. (Doc. 23.) Specifically, Eury contends that the Government only obtained an order of forfeiture for a money judgment for $1,120,000 against ILMC and never sought to forfeit specific property such as the Guest Worker Program and the ILMC Database. (Id. at 6-11.) Accordingly, "[b]ecause the government never obtained property rights in these items through the forfeiture process," Eury contends, all charges in the indictment, to the extent they require the Government to have property rights in the Guest Worker Program and ILMC Database, are legally insufficient and should be dismissed. (Id. at 12.) In response, the Government contends

---

Printgear did not have a right to any particular money or property of Adler's. Id. at 580. However, for reasons discussed in Part II.C infra, the ILMC Plea Agreement gave the Government more than the mere right to initiate forfeiture proceedings -- it gave the Government a property interest in the specific intellectual property of ILMC.

that the indictment properly includes the elements of the crimes charged and that these crimes do not require the Government's property interest to only stem from property it had successfully seized via forfeiture. (Doc. 32 at 8-12.) The Government also notes that the ILMC Plea Agreement required ILMC to forfeit "all assets," including all "intellectual property," and argues that Eury's actions frustrated the Government's right to enforce this provision. (Id. at 12-14.)

The crux of Eury's argument is that the Government did not comply with Federal Rule of Criminal Procedure 32.2, which governs criminal forfeiture, to forfeit any specific property such as the Guest Worker Program and ILMC Database. Generally speaking, for the forfeiture of specific property, Rule 32.2 requires the court to identify the specific property, ensure there is a nexus between the property and the offense, and take steps to protect any third parties who might have an interest in the property. See, e.g., Fed. R. Crim. P. 32.2(b)(1)(A), (b)(2), (c). The Government can also move to substitute property. See id. 32.2(e). Here, Eury argues, the 2014 ILMC Forfeiture Order forfeited only $1,120,000 and not any specific ILMC property, nor was it ever amended to forfeit specific property. (Doc. 23 at 11.)

It is undisputed that the Government did not formally forfeit, via the 2014 Forfeiture Order, the Guest Worker Program or ILMC Database. The key issue is whether, as a result of the ILMC Plea

19

Agreement, the Government obtained a sufficient property interest in both items to support the charges against Eury. The court ordered additional briefing on this issue -- the nature of the property interest the Government had by virtue of the ILMC Plea Agreement -- and the parties each submitted supplemental briefs. (Docs. 53-55.) After careful review, and for the reasons explained below, the court finds that the ILMC Plea Agreement gave the Government a sufficient property interest to support each of the crimes charged except that of theft of government property. Each of the four charges is addressed in turn.

### 1. Mail Fraud

Counts 1 and 2 allege a violation of 18 U.S.C. §§ 1341 and 2, mail fraud. A mail fraud conviction requires the Government to prove that Eury knowingly participated in a scheme to defraud the victim of "an interest in the money or property obtained by [Eury]" and that he used the mail to do so. See Gray, 405 F.3d at 234. As discussed above, the property interests under the fraud statutes are construed broadly and are not limited to property the Government forfeited after a Rule 32.2 forfeiture procedure. See id. ("The Supreme Court has made it clear that the federal fraud statutes should be interpreted broadly insofar as property rights are concerned." (citation omitted)). The victim has to be deprived of "an interest" in the property. See id. (emphasis added). The interest need not be one of ownership. For a conviction under

20

§ 1341, "it is sufficient that the victim was deprived of some right over its property." Id. (emphasis added). For example, the right to control can suffice. See id. at 234-35 (upholding mail fraud conviction where defendant obtained insurance proceeds unlawfully because the insurance companies had both a right to the actual money and a "property interest in controlling the disposition of their assets"). In the analogous context of the federal bank fraud statute, the Fourth Circuit has held that "property is anything in which a person has a 'right that could be assigned, traded, bought, and otherwise disposed of.'" Id. at 234 (quoting Mancuso, 42 F.3d at 845).

Further, "a contract right can constitute § 1341 property." United States v. Miller, 997 F.2d 1010, 1017 (2d Cir. 1993); see also Adler, 186 F.3d at 578 (assuming, without deciding, that the defendant's promise to pay a company out of a certain fund of money would give the company a property interest in that money, although finding that no such promise actually existed in that case). This is important here because in its plea agreement ILMC consented and agreed to forfeit "all assets" including all "intellectual property." (Doc. 1 ¶ 15.) Eury contends that "[t]he Plea Agreement did not forfeit anything." (Doc. 23 at 10.) True. However, a plea agreement is in the nature of a contract between the parties. United States v. Warner, 820 F.3d 678, 683 (4th Cir. 2016) ("When interpreting plea agreements, we draw upon contract

21

law as a guide to ensure that each party receives the benefit of the bargain." (quotations and citation omitted)). And contractual rights can constitute a sufficient property interest for purposes of the federal fraud statutes.

Mancuso is instructive. 42 F.3d at 845. In Mancuso, the defendant had a loan agreement with a bank whereby each loan was secured by a lien on the particular job contract for which financing was provided, with the defendant assigning the bank the right to collect the proceeds from that job. Id. at 838-39. The defendant proceeded to divert job proceeds directly to his company rather than the bank. Id. at 839-42. In appealing his conviction under the federal bank fraud statute, the defendant argued that the bank had no property rights in the money diverted; rather, he claimed, his was a "standard commercial arrangement creating well-recognized contractual rights and that this does not evince the ownership, custody or control necessary" under the bank fraud statute. Id. at 845 (quotations omitted). The Fourth Circuit rejected this argument and upheld the conviction. "It is impossible," the court wrote, "to accept defendants' assertion that the bank had no interest in the checks . . . After the assignments of rights, [defendant's] interest in the proceeds of the contracts was extinguished, and [the bank] held an interest in those funds. As a right that could be assigned, traded, bought, and otherwise disposed of, it is clear that the rights fall within

the universe of property that will support the bank fraud convictions." Id.

Here, ILMC consented and agreed to forfeit all its assets, including all intellectual property. This granted the Government a sufficient property interest in the specific property at issue, not merely an "inchoate right to initiate forfeiture proceedings," as Eury argues. (Doc. 53 at 6.) Assuming, as the Government alleges, that both the Guest Worker Program and the ILMC Database were ILMC assets, this interest could support a mail fraud conviction. Eury's motion to dismiss on this ground is denied.

### 2. Obstruction

Count 3 alleges a violation of 18 U.S.C. §§ 1512(c)(2) and 2, obstruction of the forfeiture action against ILMC. A conviction for obstruction of an official proceeding requires the Government to prove that Eury corruptly obstructed, influenced, or impeded "any official proceeding" or attempted to do so. Young, 916 F.3d at 384; 18 U.S.C. § 1512(c)(2). The Government need not prove that any property was actually forfeited -- just that Eury corruptly obstructed the forfeiture proceeding. Indeed, the Fourth Circuit has held that a defendant who causes the Government to forgo forfeiture can be guilty of obstruction. See Farrell, 921 F.3d at 141-42. To hold otherwise would permit a defendant, in the interim between a plea agreement agreeing to forfeit "all assets" and the entry of the actual forfeiture order, to take steps

23

to conceal or otherwise deprive the Government of those assets without facing any obstruction charges. This is what the Government alleges Eury did, in directing the transfer of the Guest Worker Program and ILMC Database on August 7, 2014, one week after ILMC pleaded guilty and before the court entered the Forfeiture Order on October 30, 2014. (Doc. 32 at 14-15.) Eury's motion to dismiss on this basis is therefore denied.

### 3. Money Laundering

Counts 5 through 9 allege a violation of 18 U.S.C. §§ 1957 and 2, money laundering. This requires the Government to prove that Eury knowingly participated in a monetary transaction involving criminally-derived proceeds of a value greater than $10,000. <u>Najjar</u>, 300 F.3d at 481; 18 U.S.C. § 1957(a). The Government must prove one of the predicate offenses -- obstruction of an official proceeding, mail fraud, or theft of government property -- to establish that Eury had criminally-derived proceeds from "specified unlawful activity" and that he engaged in a monetary transaction of more than $10,000 with those proceeds. See <u>id.</u> Once again, nothing implicates Rule 32.2. Eury's motion to dismiss on this ground will be denied.

### 4. Theft of Government Property

Finally, Count 4 alleges a violation of 18 U.S.C. §§ 641 and 2, theft of government property. For a conviction for theft of government property, the Government must prove that "(1) the money

24

or property described in the indictment is money or a thing of value of the United States [and] (2) that the defendant stole, fraudulently received, or converted to his own use (3) with the intent to permanently or temporarily deprive the government of that money or thing of value." Kiza, 855 F.3d at 601. It is true that "[t]he Fourth Circuit takes a broad view of what constitutes a 'thing of value of the United States'" for purposes of § 641. Id. However, by its terms the property must be a "record, voucher, money, or thing of value of the United States" and not "to" the United States, as a future asset may be. See 18 U.S.C. § 641 (emphasis added).

In interpreting what constitutes a "thing of value" of the United States, actual ownership of the property is sufficient. See United States v. Benefield, 721 F.2d 128, 129 (4th Cir. 1983) ("In determining whether an interest qualifies as 'any . . . money, or thing of value of the United States' under 18 U.S.C. § 641, courts have identified as critical factors the basic philosophy of ownership reflected in relevant statutes and regulations."). Government custody or possession of the property can also suffice. See id. (government possession of money before it is disbursed to employees of a military club); United States v. Matzkin, 14 F.3d 1014, 1020 (4th Cir. 1994) (government custody of pricing information submitted by a potential contractor for a Navy contract). So, too, in limited circumstances, can government

25

supervision and control -- for example, when federal money is disbursed and the government controls how it is spent. See Kiza, 855 F.3d at 601-03 (social security survivors' benefits a "thing of value" because the funds originated with the government and were regulated and accounted for by the government); Gill, 193 F.3d at 804 (same for social security disability checks).

Here, as Eury has repeatedly stressed, the United States never acquired ownership of the Guest Worker Program or the ILMC Database because it never effectuated forfeiture of either. (See, e.g., Doc. 53 at 4 ("In short, the plea agreement does not transfer ownership of any of ILMC's property to the United States. The court's order of forfeiture is what serves to transfer ownership to the United States.").) Nor did the United States ever have possession, custody, or control of either asset. Finally, while it is true that the Government exercised a sort of supervision over ILMC's property as a result of the plea agreement during the forfeiture process, the § 641 supervision cases are generally limited to situations in which the Government disbursed money it already owned and retained an interest in how those federal funds were spent. See United States v. Klingler, 61 F.3d 1234, 1236 (6th Cir. 1995) ("Federal control and supervision is relevant where money originated in the federal government and the question is whether the government has retained its interest in the property; such an inquiry is out of place where money has yet to acquire any

26

federal character."); see also United States v. 92 Buena Vista Ave., 507 U.S. 111, 124-27 (1993) (holding that the United States did not obtain an ownership interest in forfeitable property under 21 U.S.C. § 881(a)(6) until forfeiture decree).

The fact that the Guest Worker Program and ILMC Database might one day be delivered to the Government is not enough to make either object a thing of value "of" the United States; neither had "acquire[d] any federal character." See Klinger, 61 F.3d at 1236 (dismissing a § 641 charge against a customs broker who did not remit customs fees and duties to the United States because the money was not yet a "thing of value" of the United States and noting, "Clearly, an intention that money be delivered to the United States is insufficient to make it government property."). Accordingly, because the Guest Worker Program and ILMC Database were not "thing[s] of value of the United States" by virtue of the ILMC Plea Agreement or the 2014 Forfeiture Order, the court will grant Eury's second motion to dismiss Count IV. (Doc. 23.)

### D. Constructive Amendment of Indictment

Finally, Eury argues, first in his reply brief and then in his supplemental brief, that permitting this matter to proceed to trial under the facts as alleged in the indictment could risk a constructive amendment of the indictment were he to be convicted. (Docs. 43 at 3 n.1; 53 at 8-12.)

The Fifth Amendment to the U.S. Constitution provides that

27

"[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on . . . indictment of a Grand Jury." U.S. Const. amend. V. The Supreme Court has held that, for felony charges, "the Fifth Amendment requires that prosecution be begun by indictment" and "that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215–16 (1960). Broadening the bases for conviction is referred to as a constructive amendment. See United States v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994) (en banc). "Constructive amendments violate the Fifth Amendment's Grand Jury clause by allowing for the entry of a conviction on an offense different than that found by the Grand Jury." United States v. Ameyapoh, 293 F. Supp. 3d 568, 571–72 (E.D. Va. 2018).

However, not every difference between the facts alleged in the indictment and the facts proven at trial constitutes a constructive amendment. Id. The Fourth Circuit distinguishes between a constructive amendment, which occurs when the indictment is altered to change the elements of the offense charged such that the defendant is actually convicted of a different crime, and a mere variance, which occurs when different evidence is presented at trial but does not alter the crime charged. United States v. Malloy, 568 F.3d 166, 177–78 (4th Cir. 2009). "When the government, through its presentation of evidence or its argument,

28

or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment . . . occurs." Id. at 178.

The gist of Eury's constructive amendment contention is that the indictment described the Guest Worker Program and ILMC Database as "forfeited" to the United States "pursuant to the ILMC Plea Agreement of July 22, 2014, and the forfeiture order of October 30, 2014," (see, e.g., Doc. 1 ¶ 23), when they had not been formally forfeited via either. While it remains to be seen what the Government will prove at trial, Eury has yet to demonstrate a constructive amendment. Rather, the term "forfeited" relates to the factual status of the property interest, i.e., subject to a contractual promise to forfeit via the ILMC Plea Agreement, or formally forfeited subject to an order of the court. To the extent the Government cannot prove that the Guest Worker Program and ILMC Database had been "forfeited" pursuant to the 2014 Forfeiture Order but was subject to a promise to forfeit them in the ILMC Plea Agreement (as Eury contends), the possible bases for conviction would not have been broadened beyond those charged in the indictment. While Eury contends that the ILMC Plea Agreement did not have the effect of forfeiting these assets to the United States pursuant to Rule 32.2, the indictment makes clear that the property right alleged is, to that extent, based on the terms and

29

limitations of the ILMC Plea Agreement. Eury's argument that the Government is now seeking to amend the indictment to allege crimes based on the <u>forfeitability</u> of such assets based on an <u>agreement</u> to forfeit them (Doc. 55 at 7) reads the indictment too narrowly; the indictment clearly charges that the nature of the property interest is limited to the contractual promise in the ILMC Plea Agreement as well as the 2014 Forfeiture Order. Whether the interest ILMC conveyed in its plea agreement by consenting and agreeing to "forfeit" these assets suffices for the charges has already been addressed in this memorandum opinion.

This distinguishes the cases Eury relies on in his supplemental brief. <u>See</u> <u>Stirone</u>, 361 U.S. at 212; <u>Ameyapoh</u>, 293 F. Supp. 3d at 568; <u>United States v. Rosen</u>, 444 F. Supp. 2d 664 (E.D. Va. 2006). Unlike in <u>Stirone</u> or <u>Ameyapoh</u>, the Government is not attempting to prosecute Eury for a "separate crime" based on evidence that relates to "different incidents occurring at different times, involving different people, and regarding distinct acts" than those in the indictment. <u>Cf.</u> <u>Ameyapoh</u>, 293 F. Supp. 3d at 572 (constructive amendment when defendant indicted for resisting U.S. Immigration and Customs Enforcement agents, but evidence at trial showed defendant resisted U.S. Customs and Border Protection agents). Unlike in <u>Rosen</u>, the Government does not appear to be altering an "essential element" of a charged offense. <u>Cf.</u> <u>Rosen</u>, 444 F. Supp. 2d at 669 (constructive amendment when

30

government attempts to introduce evidence that a document specifically mentioned in the indictment as "not classified" was in fact classified where "evidence tending to prove the defendants attempted to obtain classified government information is essential to the conspiracy charged").

Eury was indicted for obstructing a specific forfeiture action and attempting to defraud the Government of two specific pieces of ILMC property in which the Government had an interest. Accordingly, to the extent Eury's motion to dismiss can be construed to be based on a claim of constructive amendment of the indictment, it is denied.

### E.  Motion to Dismiss Based on Fair Warning Doctrine

In his third motion to dismiss, Eury argues that the indictment should be dismissed based on a lack of fair warning that his conduct was prohibited.  (Doc. 24.)  What Eury calls the "fair warning doctrine" is an amalgamation of three related, due-process-based arguments -- vagueness, the rule of lenity, and the prohibition against ex post facto criminalization -- in which Eury questions whether the statutes he is charged with violating "made it reasonably clear at the relevant time that [his] conduct was criminal."  (Id. at 4.)  The Government opposes each argument. (Doc. 33.)  The court will consider each in turn.

First, Eury asserts that each of the statutes under which he is charged is unconstitutionally vague as applied to him.  (Doc.

24 at 1.) Specifically, he argues that the Government failed to follow proper forfeiture proceedings as to the Guest Worker Program and the ILMC Database, thereby depriving Eury of notice that the Government had any property rights in those items, and that it is "not obvious" how the Government otherwise acquired a property interest in either item. (Id. at 5-6.)

A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008). This is a high bar. As the Fourth Circuit has observed, there is a distinction between statutes that "require a person to conform his conduct to an imprecise but comprehensible normative standard" and those that specify "no standard of conduct" at all. Doe v. Cooper, 842 F.3d 833, 842 (4th Cir. 2016)) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971) (alterations omitted)).

Here, the Government is correct that the relevant statutes are not unconstitutionally vague as applied to Eury. (Doc. 33 at 5-6.) As discussed above, the property interests under the relevant statutes are interpreted broadly and can include computer programs and confidential business information. At the very least, a person of ordinary intelligence should understand that, in the wake of a plea agreement in which the corporate defendant agreed

32

to forfeit "all assets," attempts to interfere with forfeitable property could constitute, for example, obstruction of a forfeiture proceeding. Again, resolution of these issues involves disputed factual questions including the nature of ILMC's property interests in both the Guest Worker Program and the ILMC Database. But the facts as alleged in the indictment -- including that "ILMC's ownership interest in the Guest Worker Program and the ILMC Database were the property of ILMC and as such had been forfeited to the United States" -- are sufficient to survive Eury's vagueness challenge. (Doc. 1 ¶ 23.)

Next, Eury argues that the rule of lenity should apply. (Doc. 24 at 6-7.) The rule of lenity instructs that "ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." United States v. Davis, 139 S. Ct. 2319, 2333 (2019). To invoke the rule of lenity the court "must conclude that there is a grievous ambiguity or uncertainty in the statute." United States v. Bridges, 741 F.3d 464, 470 (4th Cir. 2014) (emphasis in original); see Muscarello v. United States, 524 U.S. 125, 138 (1998) ("The simple existence of some statutory ambiguity . . . is not sufficient to warrant application of [the] rule, for most statutes are ambiguous to some degree."). The court cannot say that the statutes under which Eury is indicted are "grievously" ambiguous as applied to him. There have been successful prosecutions under these statutes, for example, for obstruction of

33

a forfeiture proceeding, see Farrell, 921 F.3d at 141–42, and for mail fraud for the conversion of confidential business information, see Carpenter, 484 U.S. at 26. Nor, contrary to Eury's contention, does the Government's property theory appear to be "aggressive and novel." (Doc. 24 at 7.) This is particularly the case with the ILMC Database, the Supreme Court having held in the mail fraud context that confidential business information is "property." Carpenter, 484 U.S. at 26. While it remains to be seen whether the Government can carry its burden of proof, the fact that contested factual issues might one day be resolved in Eury's favor does not support application of the rule of lenity at the motion to dismiss stage.

Finally, Eury argues that permitting the case to go forward "would operate with an impermissible ex post facto effect." (Doc. 24 at 8.) The ex post facto prohibition "forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981) (quotations and citation omitted). The doctrine typically works to bar the legislature from passing a law that retroactively criminalizes what had been innocent conduct. See U.S. Const. art I, § 10; Calder v. Bull, 3 U.S. 386, 390 (1798). For a criminal law to be ex post facto "it must be retrospective, that is, it must apply to events occurring before

34

its enactment, and it must disadvantage the offender affected by it." Weaver, 450 U.S. at 29. The prohibition can also apply to "an unforeseeable judicial enlargement of a criminal statute, applied retroactively." Bouie v. City of Columbia, 378 U.S. 347, 353 (1964).

There are no ex post facto concerns here. The relevant statutes were enacted well before Eury's alleged conduct, and there was a significant body of case law clarifying the scope of the statutes and property interests implicated before the events in question. Except for the count related to theft of government property, which is being dismissed, the alleged conduct falls within the criminal statutes involved. This is far removed from the traditional concerns of ex post facto laws. Cf. Bouie, 378 U.S. at 362-63 (overturning criminal trespass conviction where a state court decision after the events in question changed the statutory definition of "trespass" to include remaining on the premises of another after being asked to leave and this interpretation was retroactively applied to defendants' conduct).

Accordingly, Eury's third motion to dismiss (Doc. 24) is denied.

**F. Motion to Compel Grand Jury Materials**

Eury also moves to compel grand jury materials pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E). (Doc. 25.) The Government opposes the motion. (Doc. 34.)

35

There is a strong presumption that grand jury proceedings should be kept secret.  See United States v. Procter & Gamble Co., 356 U.S. 677, 681 (1958) (noting the "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts").  This presumption is "codifie[d]" in Federal Rule of Criminal Procedure 6(e).  United States v. Sells Eng'g, Inc., 463 U.S. 418, 425 (1983).  There are limited exceptions, and Rule 6(e)(3) permits limited disclosure of grand jury materials in certain situations.  Relevant here, Eury brings his motion under subsection (E)(ii), which states, "The court may authorize disclosure -- at a time, in a manner, and subject to any other conditions that it directs -- of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).

The party seeking discovery under this provision must make "a strong showing of particularized need" for grand jury materials. Gilbert v. United States, 203 F.3d 820 (4th Cir. 2000) (per curiam) (quoting Sells, 463 U.S. at 443).  The court, in deciding whether to release grand jury materials, is to "balance the petitioner's need for release against the traditional public interest reasons for grand jury secrecy and 'only in those cases where the need for [disclosure] outweighs the public interest in secrecy' will the requirement of 'particularized need' for release be found to

36

exist.'" In re Grand Jury Proceedings GJ-76-4 & GJ-75-3, 800 F.2d 1293, 1298 (4th Cir. 1986) (quoting Sells, 463 U.S. at 443). Generally, this requires the moving party to show that without access to the materials, the "defense would be greatly prejudiced" or "an injustice would be done." Procter & Gamble, 356 U.S. at 682.

The "typical showing" of particularized need arises when a litigant seeks to use grand jury transcripts at trial to impeach a witness, refresh recollection, test credibility, and the like. Douglas Oil Co. of California v. Petrol Stops Nw., 441 U.S. 211, 222 n.12 (1979). Other examples of a "particularized need" include to avoid misleading the trier of fact and a party's inability to obtain needed discovery due to the invocation of the Fifth Amendment. RF Micro Devices, Inc. v. Xiang, No. 1:12CV967, 2016 WL 3212481, at *3 (M.D.N.C. June 9, 2016). This is a high bar, and with "rare exceptions" "most requests based on this ground are denied." 1 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Crim. § 108 (4th ed.); see also United States v. Loc Tien Nguyen, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004) ("Because grand jury proceedings are entitled to a strong presumption of regularity, a defendant seeking disclosure of grand jury information under Rule 6(e)(3)(E)(ii) bears the heavy burden of establishing that particularized and factually based grounds exist to support the proposition that irregularities in the grand jury

37

proceedings may create a basis for dismissal of the indictment." (quotations and citation omitted)).

Eury identifies two grounds that, in his view, constitute the required "particularized need" to warrant disclosure of grand jury materials: 1) that the Government failed "to correctly advise the grand jury about the nature of the property interest involved, and about whether any property had been forfeited by the United States" and 2) the "apparent provision of misleading hearsay testimony by the government to the grand jury." (Doc. 25 at 6, 7.) Neither is sufficient to overcome the presumption of secrecy at this point.

As to Eury's first ground, this is essentially a restatement of his three separate motions to dismiss, in which Eury argues that ILMC did not have a forfeitable property interest in the Guest Worker Program or the ILMC Database and that, even if it did, the Government failed to forfeit either item. (Id. at 7.) In effect, Eury is arguing that because (in his view) the Government's case is insufficient, he should be entitled to view grand jury materials. The Government is correct that this argument "presupposes that Eury's version of the law and the applicable facts are correct." (Doc. 34 at 6.) As discussed above, the court finds that the indictment sufficiently alleges, as a matter of law, the elements and sufficient facts to state charges for each crime, with the exception of the theft of government property charge, which the court is dismissing for reasons previously noted.

38

The cases Eury cites in support of his argument are distinguishable. See United States v. Stevens, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (dismissing indictment because prosecutor erroneously instructed the grand jury that the advice-of-counsel defense was not relevant at the charging stage; in fact, because "good faith reliance on the advice of counsel negates a defendant's wrongful intent, [it] is therefore highly relevant to the decision to indict"); United States v. Peralta, 763 F. Supp. 14, 19 (S.D.N.Y. 1991) (dismissing indictment in part because prosecutor's instructions to the grand jury "seriously misstated the applicable law" on constructive possession of a firearm). There is no evidence that the Government "seriously misstated the applicable law" to the grand jury in this case.

Eury's second ground for disclosing grand jury materials is that the grand jury might have received "misleading hearsay testimony" which affected its finding of probable cause. (Doc. 25 at 7-10.) The crux of this argument is an alleged discrepancy between notes an investigating agent took during an interview with Charles Snell in 2016 and a memorandum that was written after a separate interview with Snell in January 2020. (Id.) The contention appears to be that the grand jury in 2020 heard potentially misleading information before indicting Eury.

It is of course permissible to present hearsay evidence to a grand jury. United States v. Kernodle, 367 F. Supp. 844, 852

39

(M.D.N.C. 1973). Given the inherent risks associated with hearsay evidence, however, courts are careful to ensure that "false and misleading" evidence has not been presented to the grand jury, which could be grounds for dismissing an indictment. See United States v. Hogan, 712 F.2d 757, 762 (2d Cir. 1983). In other words, while Eury surmises that the grand jury may have heard "misleading hearsay testimony" (Doc. 25 at 1), he would need to show not merely that the grand jury heard hearsay evidence but that such evidence was actually false or otherwise ran a significant risk of deceiving the grand jury. See Hogan, 712 F.2d at 761 (prosecution's presentation of "extensive hearsay and double hearsay speculation . . . added a false aura of factual support to the government's case and may well have deceived the grand jurors").

The single possible discrepancy Eury highlights is thin support for a claim that the grand jury heard "false and misleading" evidence sufficient to compel disclosure of grand jury materials. Again, there is a factual dispute about the nature of ILMC's ownership interest in both the Guest Worker Program and the ILMC Database, and the Government will have to prove at trial that ILMC had a property interest in both. There does not appear to be any obvious discrepancy between the 2016 interview notes and the 2020 memorandum of interview, at least on the record currently

40

before the court.[10]  Further, the alleged discrepancy is far removed from the prosecutorial conduct appearing in the cases Eury cites, where the courts dismissed indictments after finding the Government presented the grand jury with seriously misleading evidence.  See Hogan, 712 F.2d at 760 (dismissing indictment for conspiracy to distribute heroin based on a wide range of prosecutor misconduct before the grand jury, including characterizing the defendant as a "real hoodlum," falsely presenting evidence that the defendant was a suspect in two unrelated murders, and presenting false evidence that the defendant had arranged other drug deals); Peralta, 763 F. Supp. at 21 (dismissing indictment in part because agent gave "concededly inaccurate" information to the grand jury that was "plainly contradicted" by trial testimony).

---

[10] The 2016 interview notes read, in relevant part: "Who owns the GW database?  On paper, DATA SOFTWARE [sic] – Author.  But the data w/in – we built for client – I will defer to the attorney."  (Doc. 25-5 at 1.)  The 2020 memorandum of interview reads, in relevant part: "Snell considered NCGA, ILMC, or other companies with access to the GWD to own the information contained in thier [sic] database as it was proprietary information specific to the company.  Even though Snell wrote the software, he did not own any of the information contained within the GWD."  (Doc. 25-6 ¶ 5.)  In his 2016 grand jury testimony, when asked "Who generally owned the [software] program?" Snell responded, "I think on paper, as the developer, we would have had, by default, the intellectual property rights to it.  We never asserted those.  We considered the software to be that of our clients that paid to have it built."  (Doc. 26-1 at 4 ¶¶ 12-16.)  Part of the confusion might stem from the fact that there are two separate but related pieces of property -- the Guest Worker Program and the ILMC Database -- and the questions and answers sometimes conflate the two.  Regardless, even if Snell had an ownership interest in the code of the Guest Worker Program, the evidence suggests that ILMC also had an interest in the Guest Worker Program and was the owner of the actual data in the ILMC Database.  (See Doc. 34 at 7-8.)

Accordingly, Eury's motion to compel grand jury materials is denied. (Doc. 25.)

**III. CONCLUSION**

For the reasons stated,

IT IS THEREFORE ORDERED that Defendant Craig Stanford Eury, Jr.'s motions to dismiss (Docs. 21, 23, 24) are GRANTED as to Count IV in the indictment, which is DISMISSED, and are otherwise DENIED. His motion to compel grand jury materials (Doc. 25) is DENIED without prejudice.

  /s/   Thomas D. Schroeder
United States District Judge

January 27, 2021